FELICIA HANKINS,                )
                                )
            Plaintiff,           )        No. 19-cv-00147
                                )
v.                              )        Judge Edmond E. Chang
                                )
ALPHA KAPPA ALPHA               )
SORORITY, INC, *et al*          )
                                )
            Defendants.          )

**MEMORANDUM OPINION AND ORDER**

On a winter's day in January 2017, Jordan Hankins committed suicide in her dorm room at Northwestern University. R. 11, Am. Compl. ¶ 70.[1] Jordan had allegedly suffered through severe hazing during a sorority-membership initiation process. Her mother, Felicia Hankins, now brings this case for the estate of her daughter, suing both the sorority as well as individual sorority members under the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq*, and the Illinois Survival Act, 755 ILCS 5/27-6 *et seq*.[2]

Specifically, Felicia Hankins asserts claims against Alpha Kappa Alpha Sorority, Inc. (the national sorority organization, which this Opinion will call "AKA

---

[1]Citations to the record are noted as "R." followed by the docket number.

[2]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1332. Complete diversity exists between Hankins, who is a citizen of Indiana, and each Defendant. The sorority organizations are all citizens of Illinois, Steele is a citizen of Illinois, Anderson is a citizen of Illinois (or Georgia), Brown is a citizen of Missouri, Clemons is a citizen of Illinois (or California), Chambers is a citizen of Virginia, Smith is a citizen of Illinois, Valdez is a citizen of Illinois, Greenwell is a citizen of Illinois, and Madlock-Henderson is a citizen of Illinois. The amount in controversy exceeds $75,000.

National"); the undergraduate Gamma Chi Chapter of Alpha Kappa Alpha Sorority, Inc.; the alumnae Delta Chi Omega Chapter of Alpha Kappa Alpha Sorority, Inc.; and Kathy Walker-Steele, the Central Regional Director of Alpha Kappa Alpha Sorority, Inc. Hankins also sues individual sorority members Alexandria Anderson, Jalon Brown, Alexandria Clemons, Cariana Chambers, Raven Smith, Bianca Valdez, Ava Thompson Greenwell, and Ashanti Madlock-Henderson. All of the defendants have moved to dismiss the complaint. *See* R. 57, AKA and Walker-Steele Mot. Dismiss; R. 63, Greenwell Mot. Dismiss; R. 65, Madlock-Henderson Mot. Dismiss; R. 68, Chambers Mot. Dismiss; R. 94, Smith Mot. Dismiss; R. 97, Delta Chi Omega Mot. Dismiss; R. 98, Chambers Mot. Join; R. 99, Clemons Mot. Join; R. 103, Valdez Mot. Join; R. 105, Brown Mot. Join. For the reasons discussed below, the motions to dismiss by AKA Sorority and Walker-Steele are granted, but the other motions are denied.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in the Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Jordan Hankins was a college student at Northwestern University in Evanston, Illinois. In October 2016, Jordan attended a sorority "rush" event hosted by the Gamma Chi chapter of the Alpha Kappa Alpha (AKA) sorority. Am. Compl. ¶ 57. To provide some background, AKA is a national sorority with more than 1,000 chapters located throughout the country. *Id.* ¶ 35. The chapters are each associated with college campuses. For instance, Gamma Chi is the undergraduate AKA chapter at Northwestern, while

Delta Chi Omega is the graduate (that is, alumnae) AKA chapter at Northwestern. *Id.* ¶¶ 4, 7. Each undergraduate chapter is supervised by a graduate chapter. *Id.* ¶ 38. So at Northwestern, the undergraduate Gamma Chi chapter is supervised by the graduate Delta Chi Gamma chapter. *See id.* ¶¶ 7, 38. And both chapters are in turn governed by the rules and by-laws of the national sorority. *Id.* ¶¶ 5, 8.

Shortly after attending the October 2016 rush event, Jordan received an email from Ava Thompson Greenwell, a member of Delta Chi Omega and one of the graduate advisors for Gamma Chi. Am Compl. ¶ 59. Greenwell told Jordan that she was "cleared to move to the next stage of the Alpha Kappa Alpha Sorority, Inc. membership process." *Id.* Jordan then spent the next month going through the membership-intake process along with ten other women who were also "pledging" to join the sorority. *Id.* ¶ 60. The membership process culminated in a performance in a "campus introduction" show on November 20, 2016. *Id.* ¶ 63.

After the campus introduction show, Jordan had ostensibly completed the official pledging process and was initiated into the sorority. But at that point, Jordan was told "by members of AKA Sorority that as a condition of membership," she would have to go through an additional "*post*-initiation pledge process." Am. Compl. ¶ 64 (emphasis added). This is when the hazing began. *Id.* ¶ 67. During the post-initiation pledging process, Jordan was allegedly subjected to "several instances" of "physical abuse including paddling, verbal abuse, mental abuse, financial exploitation, sleep deprivation, items being thrown and dumped on her, and other forms of hazing intended to humiliate and demean her." *Id.* ¶¶ 66-67. According to Hankins, these

hazing acts were carried out by sorority members Anderson, Brown, Clemons, Chambers, Smith, Valdez, Greenwell, and Madlock-Henderson. *Id.* ¶ 222.

The hazing damaged Jordan's physical and mental health. Am. Compl. ¶ 68. Eventually, Jordan "communicated to members of AKA Sorority, including individually named defendants, that the hazing was triggering her PTSD, causing severe anxiety and depression and that she was having suicidal thoughts." *Id.* ¶ 69. On January 9, 2017, Jordan committed suicide in her dorm room. *Id.* ¶ 70.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

Hankins brings a total of 16 wrongful-death and survival claims[4] against the entire AKA organizational hierarchy, from the individual sorority members who allegedly hazed Jordan to the local sorority chapters and all the way up to the national AKA organization. All of the claims are rooted in the same general theory of negligence.[5] Specifically, Hankins alleges that the defendants were negligent because they knew that Jordan was suicidal, yet still hazed her (or failed to protect her from hazing, in the case of the sorority entities), which ultimately caused her to commit suicide. All of the defendants have moved to dismiss the claims.

---

[4]Wrongful-death actions are meant to compensate for the injuries suffered by Jordan's family, whereas the survival actions target the injuries sustained by Jordan herself. *See Wyness v. Armstrong World Indus., Inc.*, 546 N.E.2d 568, 571 (Ill. 1989). The details about who suffered what damages and how the damages should be apportioned between the wrongful-death and survival claims can be addressed at a later stage. For now, at the motion to dismiss stage, it is only necessary to determine whether the underlying causes of action for these claims (such as negligence) have been sufficiently pled as a matter of law.

[5]The only non-negligence claims are two counts of intentional infliction of emotional distress against the individual sorority members, which will be addressed later.

## A. Individual Sorority Members

First up are the claims against the individual sorority members. This is the most straightforward set of allegations—the sorority members hazed Jordan, causing her severe emotional distress, which then led to her suicide. Specifically, Hankins asserts two counts of negligence (Counts 11 and 12), two counts of intentional infliction of emotional distress (Counts 13 and 14), and two counts of negligent infliction of emotional distress[6] (Counts 15 and 16) against several undergraduate members of the Gamma Chi Chapter—Anderson, Brown, Clemons, Chambers, Smith, and Valdez. Hankins also names two graduate members of the Delta Chi Gamma Chapter—Greenwell and Madlock-Henderson—who served as graduate advisor and assistant graduate advisor to Gamma Chi, respectively. All of the defendants have moved to dismiss the claims, but for the reasons explained below, the motions to dismiss are denied.

---

[6]To state a cause of action for negligent infliction of emotional distress, a plaintiff must allege facts establishing either that she suffered a direct impact that caused emotional distress, or that she was a bystander in a zone of physical danger that caused her to fear for her own safety and that she suffered physical injury or illness as a result of her emotional distress. *Borcia v. Hatyina*, 31 N.E.3d 298, 310 (Ill. App. Ct. 2015). So, the Court recognizes that negligent infliction of emotional distress is technically a bit different from a regular negligence claim, particularly when it comes to the distinction between the wrongful-death and survival claims. (For instance, Jordan's family might need to proceed under the bystander route instead of the direct-victim route for purposes of their wrongful-death claim.) But the threshold question for a negligent infliction of emotional distress claim is still whether the plaintiff properly alleged negligence on the part of the defendant. *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 58 (Ill. 2016). So for now, the Court will just focus on whether the elements of negligence have been adequately pled.

The Court also notes that the same set of facts seem to underlie the claims for negligence and negligent infliction of emotional distress. Going forward, Hankins should consider whether she needs both theories of liability, especially when the goal should be to simplify the case for a jury.

# 1. Negligence

Turning first to the negligence-based claims, Hankins must specifically show that the sorority members owed Jordan a duty to refrain from hazing, that they breached that duty by hazing her, and that the hazing proximately caused Jordan's injuries and death. *Bogenberger v. Pi Kappa Alpha Corp., Inc.*, 104 N.E.3d 1110, 1118 (Ill. 2018) (cleaned up). The two main points of dispute here are duty and proximate cause, which the Court will consider in turn.

In terms of the first element, duty, the question of whether a legal duty exists depends on four factors: "the reasonable foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant." *Bogenberger*, 104 N.E.3d at 1124-25. In *Bogenberger*, the Illinois Supreme Court specifically applied those factors to fraternity-membership hazing and readily concluded that individual fraternity members owed a duty to pledges to refrain from hazing. According to the Illinois Supreme Court, hazing injuries are both reasonably foreseeable and likely to occur, as evidenced by the enactment of state anti-hazing statutes, as well as by the fact that the national fraternity organization itself prohibited hazing. *Id.* at 1125. And on the third factor, *Bogenberger* held that the burden of guarding against hazing injuries is "infinitesimal," in that "[t]here can be no real burden to require [the fraternity members] to comply with the law and the university's and fraternity's rules." *Id.* Finally, the Illinois high court concluded that it was reasonable to place that burden

on the fraternity members, who "knowingly and willingly agreed to participate in the hazing event[.]" *Id*. at 1126.

So, applying *Bogenberger* to this case, the answer is straightforward as to the individual sorority members. Hazing as a general matter is dangerous and likely to lead to injury. There is very little burden in requiring the sorority members to comply with state anti-hazing laws, not to mention the official policies of AKA National, which prohibit both hazing *and* post-initiation pledging. *See* Am. Compl. ¶ 40. And finally, it is reasonable to place that burden on the sorority members, because Hankins alleges that the individual sorority members "knowingly and willingly" participated in post-initiation pledging activities in which they "promoted multiple hazing activities" as a condition of membership in the Gamma Chi chapter. *Id*. ¶ 216. Thus, under *Bogenberger*, it is clear that the individual AKA sorority members owed Jordan Hankins a duty, and they breached that duty by hazing her (on the alleged facts, which must be accepted as true right now).

Moving on to causation, even if Hankins has successfully alleged that the individual sorority members had a *duty* to not haze Jordan, she also must adequately allege that the hazing *proximately caused* Jordan to commit suicide. Proximate cause also "involves an assessment of foreseeability." *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015). But this is a different foreseeability analysis than the foreseeability requirement in the duty context. *Stanphill v. Ortberg*, 91 N.E.3d 928, 939 (Ill. App. Ct. 2017) ("Although reasonable foreseeability is relevant to both duty and proximate cause, courts must take care to keep duty and proximate cause

analytically independent by differentiating between two distinct problems in negligence theory—the unforeseen plaintiff problem and the problem of the foreseeable injury resulting from unforeseen means.") (cleaned up), *aff'd*, 129 N.E.3d 1167 (Ill. 2018). In other words, to establish duty, Hankins only had to adequately allege that the practice of hazing is likely to lead to *some* injury in general, without regard to the precise injury. (And *Bogenberger* clearly holds that hazing is dangerous and injury is foreseeable.) When it comes to proximate cause, though, Hankins has to show that this *particular* type of injury—suicide—is a foreseeable result of hazing. In that context, "[t]he relevant inquiry is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Abrams v. City of Chicago*, 811 N.E.2d 670, 675 (Ill. 2004) (cleaned up).

Here, the sorority members sharply dispute the causal link between the hazing and the suicide. The sorority members point to the Illinois Supreme Court's decision in *Turcios*, which set forth the "general rule" that "the injured party's voluntary act of suicide is an independent intervening act, which is unforeseeable as a matter of law[.]" 32 N.E.3d at 1123. Here, too, the sorority members argue, the causal link between Jordan's hazing and her death was broken by the independent intervening event of Jordan's *own* decision to commit suicide. In the sorority members' view, the response to this case should be straightforward—the Court should simply apply the so-called "suicide rule" and dismiss all of Hankins's claims.

The problem with this argument, though, is that the Illinois Supreme Court did not hold that suicide is *always* unforeseeable as a matter of law. Rather, *Turcios*

only set forth a general presumption—albeit a strong one—that can still be overcome if a plaintiff is able to "plead facts demonstrating that the suicide was foreseeable." *Turcios*, 32 N.E.3d at 1128. To be sure, that is a tall order: the Illinois Supreme Court acknowledged that "suicide may result from a complex combination of psychological, psychiatric, chemical, emotional, and environmental factors." *Id*. As a result, "it is the rare case in which the decedent's suicide would not break the chain of causation and bar a cause of action for wrongful death, even where the plaintiff alleges the defendant inflicted severe emotional distress." *Id*. But rare is not the same as impossible.[7] Indeed, the Illinois high court recently confirmed that it is possible for a plaintiff to satisfy the proximate-causation element in a case of suicide. *See Stanphill v. Ortberg*, 129 N.E.3d 1167,1177 (Ill. 2018) ("[O]ur courts have held that, where a plaintiff can show that the suicide was a reasonably foreseeable result of the defendant's conduct, liability will attach.").

With no absolute ban on negligence claims in suicide cases, the Court must assess whether Jordan's suicide was a reasonably foreseeable result of the hazing in this case. Hankins alleges that Jordan "communicated to members of AKA Sorority,

---

[7]The Defendants assert that Illinois courts have only recognized two categories of "exceptions" to the general rule that suicide is unforeseeable: (1) psychiatric malpractice cases, in which a physician fails to supervise a decedent with known suicidal tendencies; and (2) physical head-injury cases, in which a defendant causes a physical injury to the victim's head, resulting in the victim becoming "insane and bereft of reason" and then committing suicide. *See* AKA and Walker-Steele Mot. Dismiss at 8 (citing *Winger v. Franciscan Med. Ctr.*, 701 N.E.2d 813, 819-20 (Ill. App. Ct. 1998)). According to the Defendants, because Jordan Hankins's case does not fall within either of those two exceptions, then her suicide should be deemed unforeseeable as a matter of law. But there is no suggestion in any Illinois Supreme Court caselaw, including *Turcios* or *Stanphill*, that these categories are the *only* possible exceptions to the general presumption against suicide liability.

including individually named defendants, that the hazing was triggering her PTSD, causing severe anxiety and depression and that she was having suicidal thoughts." Am. Compl. ¶ 69. The Amended Complaint also sets out specific examples of the physical and mental abuse—paddling, sleep deprivation, financial exploitation, sleep deprivation, things thrown and dumped on Jordan—that exacerbated Jordan's mental-health disorders. *Id*. ¶ 67. Indeed, all of this culminated in an actual plan to commit suicide, made known to the individual members: Hankins directly alleges that "Anderson, Brown, Clemons, Chambers, Smith, Valdez, Thompson Greenwell, and Madlock-Henderson were advised that the hazing was triggering [Jordan's] PTSD, severe depression and anxiety, she was mentally unstable, and she explicitly expressed she was suicidal and had a *plan to commit suicide*." *Id*. ¶ 212 (emphasis added).

Based on those allegations, Hankins has sufficiently pled foreseeability. Although there is no bright-line rule for establishing foreseeability, Illinois case law provides some guidance on which types of allegations are too bare bones to suffice. In *Turcios*, for instance, the plaintiff simply alleged that "as a result of the wrongful acts of Defendant," the decedent committed suicide. *Turcios*, 32 N.E.3d at 1123. That type of allegation is more conclusion than fact. Hankins, on the other hand, goes well beyond just a mere conclusion and instead sets forth actual facts. But the Defendants also cite an Illinois Appellate Court decision in which the plaintiff alleged that the defendant "knew that the decedent was suicidal and made deliberate and coordinated attempts," via internet chats, "to encourage her to take her own life." *Doe v. Doe*, 67

11

N.E.3d 520, 525 (Ill. App. Ct. 2016). *Doe* held that those allegations were not enough to satisfy the proximate-cause requirement. *Id*. Comparing the Amended Complaint here with *Doe* yields a much closer call, because at least some facts are embedded in the allegations in *Doe*. But at the pleading stage, Hankins's allegations are enough: the Amended Complaint alleges a specific link between the hazing conduct and the suicide, because Hankins not only alleges that Jordan explicitly told the sorority members that the hazing was triggering her mental-health issues, Am. Compl. ¶ 69, but as noted earlier, Hankins also provides specific examples of the physical and mental abuse that exacerbated Jordan's symptoms*, id*. ¶ 67 (alleging paddling, sleep deprivation, financial exploitation, things thrown and dumped on Jordan). Jordan even went so far as to tell the sorority members that she had a *plan* to commit suicide, *id*.—not just that she was generally depressed or suicidal. At the pleading stage, these explicit allegations are enough to hold that suicide would have been a reasonably foreseeable outcome of the hazing. And for what it is worth, there does not appear to be any Illinois precedent foreclosing liability based on allegations that a victim explicitly told defendants that (1) their misconduct was triggering symptoms of the victim's mental-health issues; and (2) the victim had a plan to commit suicide. It is of course possible that discovery will eventually reveal facts that undermine the causal link. But for now, Hankins has sufficiently pled proximate causation. So because Hankins has adequately stated a plausible claim for negligence against the sorority members, the motions to dismiss those claims are denied.

## 2. Intentional Infliction of Emotional Distress

In addition to the negligence claims, Hankins also brings two counts of intentional infliction of emotional distress against the individual sorority members. Under Illinois law, this type of emotional-distress claim requires three elements. "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (cleaned up). To qualify as extreme and outrageous, the conduct "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Id*. at 83.

Here, Hankins alleges that, during the post-initiation pledging stage, Jordan "was subjected to physical abuse including paddling, verbal abuse, mental abuse, financial exploitation, sleep deprivation, items being thrown and dumped on her, and other forms of hazing intended to humiliate and demean her." Am. Compl. ¶ 67. This conduct, according to Hankins, was "extreme, outrageous, and unlawful." *Id*. ¶ 223. Hankins also alleges that the sorority members intended to cause Jordan "to suffer humiliation, mental anguish, and emotional and physical distress." *Id*. ¶ 224. And finally, Hankins alleges that the hazing did in fact cause Jordan to suffer severe emotional distress. *Id*. ¶ 226.

In response, the sorority members argue that the acts listed by Hankins do not rise to the level of "extreme and outrageous" conduct. *See* Greenwell Mot. Dismiss at

7; Madlock-Henderson Mot. Dismiss at 10. But even AKA National banned hazing, defining it (in pertinent part) as "behavior which is directed against any individual(s) for the purpose of causing shame, abuse, insult, humiliation, intimidation or disgrace." Am. Compl. ¶ 40. And as Hankins points out, the Illinois Supreme Court in *Bogenberger* "described hazing as both illegal and dangerous." R. 101, Pl.'s Resp. Br. at 17 (citing *Bogenberger*, 104 N.E.3d at 1125). Plus, the specific conduct alleged by Hankins—paddling, financial exploitation, sleep deprivation, items being thrown and dumped on Jordan—is even more concrete than just the label "hazing." So, for purposes of the pleading stage, Hankins has adequately alleged extreme and outrageous conduct.

Just like on the negligence claim, the sorority members also argue that Jordan's suicide was unforeseeable and thus broke the chain of causation. *See* Greenwell Mot. Dismiss at 6; Madlock-Henderson Mot. Dismiss at 8. But as explained above, Hankins has adequately pled foreseeability on the part of the individual sorority members. Thus, the intentional infliction of emotional distress claims survive for now.

## B. National Sorority Organization

Moving to the other end of the organizational hierarchy, Hankins also asserts eight claims against the national parent organization, Alpha Kappa Alpha Sorority, Inc. (or "AKA National" for short). Unlike the individual sorority members, there is no allegation that AKA National was directly involved in any hazing. Rather, the gist of the claims—which encompass negligent supervision (Counts 1 and 2), negligent

entrustment[8] (Counts 5 and 6), and ordinary negligence (Counts 9, 10, 11, and 12)—is that AKA National is both vicariously and directly liable for the hazing practices carried out by the local chapters and individual sorority members. The Court will address each theory of liability in turn.

### 1. Vicarious Liability

Hankins hopes to invoke a theory of vicarious liability under which AKA National can be held responsible for the misconduct of its alleged agents—that is, the local chapters and their members—even if AKA National did not itself engage in any negligent conduct. But this assumes that an agency relationship is adequately pled. In order to plead agency liability under Illinois law, Hankins must sufficiently allege that (1) a principal-agent relationship existed; (2) the principal controlled or had the right to control the conduct of the agent; and (3) the conduct fell within the scope of the agency. *Bogenberger*, 104 N.E.3d at 1119.

The problem for Hankins is that the Illinois Supreme Court recently set a sky-high bar for alleging the existence of an agency relationship between a national fraternity organization and its local chapters. *Bogenberger*, 104 N.E.3d at 1119. In *Bogenberger*, the Illinois high court held that the national fraternity was *not* vicariously liable for the hazing misconduct of one of its local chapters. It is true that

---

[8]It is not clear that negligent entrustment is even a viable cause of action on these facts. According to the Illinois Supreme Court, "[t]here are two primary considerations in negligent-entrustment analysis: (1) whether the owner of the vehicle entrusted the car to an incompetent or unfit driver, and (2) whether the incompetency was a proximate cause of a plaintiff's injury." *Evans v. Shannon*, 776 N.E.2d 1184, 1190 (Ill. 2002). Here, there is no allegation that any of the defendants negligently entrusted a car (or any dangerous object) to an incompetent user. In any event, these claims are dismissed on other bases as well, as explained in more detail below.

the plaintiff in *Bogenberger* failed to allege that the national organization "authorized" the chapter to act on its behalf or "held out" the chapter as its agent. *Bogenberger*, 104 N.E.3d at 1120. Here, by contrast, Hankins does allege that AKA National "grants authority to chapters to act as agents of the national organization to conduct sorority business" and "holds out each local graduate and undergraduate chapter, including but not limited to, Delta Chi Omega and Gamma Chi, and their duly appointed or elected officers and members, as its agents with authority to act on its behalf." Am. Compl. ¶¶ 77, 150. So, Hankins has potentially alleged enough for a general principal-agent relationship (the first factor).

But the second factor presents a taller hurdle. *Bogenberger* held that a national fraternity did not "control" its local chapter even though it had a myriad of supervisory powers over it. *Bogenberger*, 104 N.E.3d at 1120-21. The national fraternity wielded the power to expel, suspend, or place restrictive remedial conditions on local chapters and members; promulgated rules that the local chapters were supposed to follow; encouraged pledging events, including the event that led to the hazing death at issue in the case; could assist local chapters in the conduct of pledging activities; could require anti-alcohol and anti-hazing education; and generally "controlled the activities and conduct" of its local chapters. *Id.* at 1120. The complaint in that case also alleged that the national organization received reports on local chapters from "chapter consultants who conducted on-site, weeklong assessments of chapters," and as a result, the national organization knew that the particular chapter at issue lacked risk management safeguards and had a reputation

as "a fraternity of meatheads." *Id.* (cleaned up). But that long list of forms of control and supervision ultimately did not matter: the Illinois Supreme Court held that the complaint did not adequately allege that the national fraternity was vicariously liable for the local's hazing. *Id.* at 1120-21.

In order to clear this pleading hurdle, then, Hankins must offer something more than the already-extensive allegations in *Bogenberger*. Hankins alleges that AKA National had "the sole discretion to initiate members into the sorority," such that no local chapter "can initiate new members without approval from" AKA National. Am. Compl. ¶ 148. AKA National also allegedly "maintains full control" of creating the code of conduct for membership and determines "member discipline such as suspension and expulsion." *Id.* ¶ 150. In particular, "members are required to follow the rules of AKA, all sorority rush activities of both Gamma Chi and Delta Chi Omega are approved by AKA, and AKA has the authority to suspend operations of either chapter." Pl.'s Resp. Br. at 15.

According to Hankins, all of this "confirms a level of control of the pledging process that simply was not present in *Bogenberger*." Pl.'s Resp. Br. at 15. But Hankins overstates the differences between the two cases. For instance, the national fraternity in *Bogenberger* similarly had the power to suspend and discipline local chapters and members, but the Illinois Supreme Court specifically noted that the "power to take remedial action after the fact does not amount to the right to direct or control a local chapter or member's actions." 104 N.E.3d at 1120 (cleaned up). And in other respects, the allegations in *Bogenberger* seem to go even further in the direction

of control—for instance, the *Bogenberger* fraternity supposedly sent consultants to conduct assessments of local chapters and had direct knowledge that the chapter in question was problematic. *Id.* But that, too, was insufficient to establish control. Overall, Hankins's allegations are not sufficiently distinct from the ones in *Bogenberger* to surmount the high bar for establishing the control requirement.

But even if Hankins had somehow successfully pled the second element of agency liability, the Amended Complaint would still fail on the third. *Bogenberger* explicitly held that "hazing conduct fell outside the scope of any alleged agency relationship" where "it was against National's rules to include hazing within those pledging events." *Bogenberger*, 104 N.E.3d at 1120-21. In other words, even though the local chapter was officially authorized to hold *pledging* events, "[p]ledging and hazing are not synonymous." *Id.* at 1121. Here, too, Hankins acknowledges (and even pleads) that AKA National explicitly prohibits hazing in its official policies. Am. Compl. ¶¶ 39-40. In addition, the hazing in this case occurred during the *post-initiation* pledging stage, which is also officially prohibited by AKA National. *Id.* ¶ 40. So, applying *Bogenberger*, any post-initiation hazing carried out by the chapters or the sorority members necessarily falls outside the scope of agency. All in all, Hankins has failed to plead that AKA National is vicariously liable for the conduct of its local chapters or individual sorority members.

## 2. Direct Liability

Alternatively, Hankins alleges that AKA National was directly liable for Jordan's death. In order to establish direct liability, Hankins must adequately allege

that AKA National owed a duty to Jordan, that AKA National breached its duty, and that the breach was the proximate cause of injury. *Bogenberger*, 104 N.E.3d at 1118. Here, Hankins alleges that AKA National allowed the chapters to practice harmful initiation rituals, failed to warn local chapters about the dangers of hazing, failed to take reasonable steps to ensure that local chapters were not engaged in hazing, and failing to train sorority advisors. Am. Compl. ¶ 82.

As explained earlier, whether a legal duty exists traditionally depends on four factors: "the reasonable foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendants." *Bogenberger*, 104 N.E.3d at 1124-25. According to Hankins, these four factors are satisfied here because hazing is a foreseeable cause of injury, and it is reasonable to place the burden on AKA National to prevent hazing because AKA National had sole authority to oversee membership activities and supervise the local chapters. Pl.'s Resp. Br. at 13.

But this is not a traditional tort case. Hankins's theory of liability is not rooted in any allegations that AKA National directly hazed Jordan, but rather that AKA National should have done a better job of *protecting* Jordan from the misconduct of others (here, the sorority members). Under Illinois law, direct liability on this sort of "failure to protect" theory has also been foreclosed by *Bogenberger*. Indeed, Hankins's allegations almost completely mirror the direct-liability allegations in *Bogenberger*. 104 N.E.3d at 1121. Both essentially boil down to the same claim that the national organization "should have taken certain affirmative action to protect the pledges from

hazing and to control the criminal conduct of those who participated in the hazing." *Id*. In Illinois, however, "an affirmative duty to aid or protect another against an unreasonable risk of physical harm or to control the conduct of another arises only within the context of a legally recognized special relationship." *Id*. (cleaned up). "If no special relationship exists that would impose an affirmative duty upon the Nationals to protect the pledges or to control those who hazed the pledges, then the Nationals owe no affirmative duty to the pledges." *Id*. at 1122.

In other words, in these types of failure-to-protect cases, the traditional four-factor duty analysis does not even come into play unless a special relationship is first established. So there can only be direct liability if a "special relationship" exists between AKA National and Jordan Hankins. Again, however, the Illinois Supreme Court has set a high bar for establishing such a relationship, essentially taking a categorical approach to the issue: if the relationship does not fall within one of four "legally recognized" categories, then there is no special relationship. *Bogenberger*, 104 N.E.3d at 1122. The four categories are: (1) common carrier and passenger; (2) innkeeper and guest; (3) custodian and ward; and (4) landholder and member of the public who enters the land. *Id*. the Illinois high court acknowledged that a few other states had imposed liability in similar hazing situations, but reiterated that under *Illinois* law, the national fraternity did not have an affirmative duty to protect unless there was a special relationship—which there was not. *Id*. at 1124. Here, too, the analysis is relatively straightforward; AKA National is not covered by any of the four categories, so the special-relationship requirement has not been met.

Despite all this, Hankins advances one final argument for why this case is different from *Bogenberger*. Hankins argues that the special-relationship requirement does not actually apply to this case because "there is no meaningful distinction between the local chapters and the national AKA organization—they are one and the same." Pl.'s Resp. Br. at 2. The theory here is that unlike in *Bogenberger*, where the local chapter served as a buffer between the national fraternity and the misconduct of the individual members, there is no similar buffer between AKA National and the individual sorority members because the local chapters (Delta Chi Gamma and Gamma Chi) do not actually exist as organizations separate from AKA National. As explained in more detail below, even though *Bogenberger* made it difficult to hold national fraternities liable for hazing, the Illinois Supreme Court quite readily concluded that the local chapter *was* directly responsible for hazing, so there was no need to even conduct a special-relationship analysis (which only applies to failure-to-protect cases). *Bogenberger*, 104 N.E.3d at 1125. In other words, *Bogenberger* made it difficult to hold national organizations liable for the misconduct of local chapters but left the door wide open to holding local chapters liable for their own misconduct.

Here, argues Hankins, AKA National should be treated like the local chapter in *Bogenberger*. That is, the Court should simply remove Delta Chi Omega from the equation and instead hold AKA National liable in place of Delta Chi Omega. In support of this theory, Hankins cites to a status report filed by Delta Chi Omega, in which the graduate chapter argues that "neither Delta Chi Omega nor Gamma Chi

have a *legal* existence separate from [AKA National]." R. 91, Status Rep. ¶ 3 (emphasis added). The status report notes that Delta Chi Omega is not independently incorporated and is not organized as a business entity in any state. *Id.* ¶ 3(b). Moreover, Hankins points out that when individuals join Delta Chi Omega, they technically pay dues to AKA National and receive membership cards listing them first as members of AKA National and secondarily as members of Delta Chi Omega. *Id.* ¶ 3(d).

But just because Delta Chi Omega is not formally incorporated as a separate *business* entity does not necessarily mean that it does not have a separate *legal* existence. For example, Illinois law is clear that an *un*incorporated association "may sue and be sued in its own name." 735 ILCS 5/2-209.1. Indeed, the local chapter in *Bogenberger* was classified as an unincorporated association that could independently be held liable for hazing even though the national fraternity was dismissed from the case. 104 N.E.3d at 1125. *See also Quinn v. Sigma Rho Chapter of Beta Theta Pi Fraternity*, 507 N.E.2d 1193 (Ill. App. Ct. 1987) (holding a local fraternity chapter liable for hazing as a voluntary unincorporated association).

On this point, Delta Chi Omega itself advances an argument for why it has no real legal existence (and should thus be dismissed completely from the case). Delta Chi Omega Mot. Dismiss at 2. To be clear, Delta Chi Omega does not dispute that unincorporated associations can be sued under Illinois law. Rather, the argument is that Delta Chi Omega is merely a *corporate division* of AKA National. And corporate divisions are different from unincorporated association—most importantly, corporate

divisions are not amenable to suit separate and apart from the corporate parent. *Id.* at 2 (citing *Salzstein v. Bekins Van Lines, Inc.*, 747 F. Supp. 1281, 1282 n.1 (N.D. Ill. 1990) (noting that "by definition a corporate division is not a separate legal entity and hence is not suable[.]")).

But the problem is that Delta Chi Omega does not actually explain why it should be classified as a corporate division instead of an unincorporated association. The Amended Complaint, for instance, clearly alleges that Delta Chi Omega is a "*chapter* of AKA Sorority." Am. Compl. ¶ 7 (emphasis added). Nowhere in the Amended Complaint does Hankins describe Delta Chi Omega as a "corporate division." In contrast, in cases actually involving corporate divisions, the complaints have explicitly named the entity in question as a "division" of a corporation. *See Salzstein*, 747 F. Supp. at 1282 n.1 (complaint characterized corporate division as "division of Graebel/Wisconsin Movers, Inc."); *Peck v. Rockwell Int'l Corp. Switching Sys. Div.*, 1988 WL 142860, at *1 (N.D. Ill. Dec. 30, 1988) (affidavit characterized corporate division as "Switching Systems Division"); *Hubbell v. Multigraphics, Div. of AM Int'l*, 1989 WL 81963, at *1 (N.D. Ill. July 14, 1989) (complaint characterized corporate division as "Multigraphics Division"). Nor does Delta Chi Omega cite any legal authority that would tip the scale in favor of the sorority chapter being a corporate division. In fact, in the two Illinois fraternity hazing cases cited above, both chapters were clearly treated as unincorporated associations. *See Bogenberger*, 104 N.E.3d at 1125; *Quinn*, 507 N.E.2d at 1193.

Moreover, from a factual standpoint, there are a number of allegations in the pleadings suggesting that Delta Chi Omega is indeed a separate legal entity. For instance, the AKA Constitution makes clear that local chapters have the power to select their own members, adjudicate disputes between their members, and issue their own bylaws (as long as they do not conflict with the official AKA Bylaws). R. 135, Exh. 1, AKA Const. and Bylaws at 16. Mere divisions of a corporation do not do those things. The status report contends that Delta Chi Omega "exists solely within AKA Inc.'s corporate organization," Status Rep. 3(c), but that is not true—chapters are allowed to "incorporate in the chapter's name for the sole purpose of purchasing property" or "may incorporate a foundation for the purpose of planning and executing Sorority Programs." AKA Const. and Bylaws at 25. Also, the AKA Bylaws treat chapters as having a separate *financial* existence: chapters are required to send annual reports of their "income and disbursements" for each fiscal year to AKA National, and chapters are also required to pay a separate "chapter tax" to AKA National." *Id*. at 58-59.[9] Nor does the membership-card reference to both AKA National and Delta Chi Omega show anything other than that individuals can be members of *both* organizations. It certainly does not suggest that Delta Chi Omega has no independent legal existence. And finally, on the contention that the sorority members pay dues to AKA National, *see* Status Rep. ¶ 3(d), the Bylaws actually say

---

[9]Another point demonstrating Delta Chi Omega's separate existence is that was able to retain its own separate legal counsel and is explicitly taking a position at odds with AKA National.

that members "shall pay to the *local chapter* all regular dues and assessments." AKA Const. and Bylaws at 47.

All of this—combined with the fact that Illinois courts have previously held local fraternity chapters liable as unincorporated associations—leads to the plausible inference that Delta Chi Omega is a separate legal entity capable of being sued as a separate defendant. So the Court disagrees with Hankins's assertion that there is no legal-entity layer between AKA National and the hazing misconduct in this case. Delta Chi Omega, as a separate legal entity, provides that buffer. In sum, to circle back to the previous discussion, AKA National can only be held liable for failing to protect Hankins from third-party hazing if a special relationship is adequately alleged. Because the Amended Complaint does not do that, there is no need to analyze the four traditional duty factors or proximate cause. The claims against AKA National are dismissed.

## C. Walker-Steele (Central Regional Director)

Hankins also asserts wrongful-death and survival claims against Kathy Walker-Steele, who served as AKA's Central Regional Director during the relevant time. In that role, Walker-Steele had oversight of nearly 100 graduate and undergraduate AKA chapters located throughout the Midwest. Am. Compl. ¶ 10. The claims against Walker-Steele are premised on negligent supervision (Counts 3 and 4) and negligence (Count 7). According to Hankins, Walker-Steele, as an agent of AKA National, was responsible for implementing the "internationally mandated processes and policies and enforce them when supervising Gamma Chi." *Id*. ¶¶ 103, 149. At

some point, Walker-Steele was "advised" that the hazing was triggering Jordan's "PTSD, severe depression and anxiety, she was mentally unstable, and she explicitly expressed she was suicidal and had a plan to commit suicide." *Id.* ¶ 105. Yet Walker-Steele allegedly still allowed Jordan to suffer through hazing during the Gamma Chi membership process. *Id.* ¶ 104.

The claims against Walker-Steele fail for largely the same reasons as did the claims against AKA National. Here, too, Hankins is not alleging that Walker-Steele *personally* carried out any of the hazing. Rather, the allegations against Walker-Steele essentially rely on the same failure-to-protect theory as the claims against AKA National discussed above. Am. Compl. ¶ 104. As a result, the same special-relationship requirement applies to the negligence claims against Walker-Steele. *Bogenberger*, 104 N.E.3d at 1121. Like with AKA National, Hankins has failed to allege that any of the four special-relationship categories apply to Walker-Steele, so the Court cannot hold that Walker-Steele had an affirmative duty to protect Jordan from third-party hazing. Walker-Steele's motion to dismiss is thus granted, and all of the claims against her are dismissed.

### D. Local Chapters

Finally, Hankins asserts claims against the local AKA chapters—Delta Chi Omega, the graduate chapter (that is, alumnae chapter) at Northwestern University, and Gamma Chi, the undergraduate chapter. The claims here (Counts 3, 4, 7, 8, 9, 10) are again rooted in a negligence theory. Although Hankins names both chapters, Hankins has not yet served Gamma Chi, so the undergraduate chapter is not formally

a party to this lawsuit at the moment.[10] Thus, this section will only address Delta Chi Omega.

As a threshold matter, Delta Chi Omega argues that the graduate chapter should be completely dismissed as a defendant because it has no separate legal existence from AKA National, and as a result, it is not actually capable of being sued. Delta Chi Omega Mot. Dismiss at 2. But that is not right, as explained in the previous section of this Opinion. In short, even though Delta Chi Omega may not be separately incorporated as a standalone business entity, it may still be sued under Illinois law as an unincorporated association (just like the local chapters in *Bogenberger* and *Quinn*).

Turning to the substance of the claims against Delta Chi Omega, *Bogenberger* again controls. Under *Bogenberger*, even if a national fraternity organization does not have an affirmative duty to protect pledges from hazing, the local chapter whose members carried out the hazing can certainly be held liable for hazing. *Bogenberger*, 104 N.E.3d at 1125. According to the Illinois Supreme Court, under those circumstances, it is reasonable to place the burden of guarding against hazing injury on the "very people who are in charge of planning and carrying out the pledge event." *Id*. The same analysis of the duty element applies here: hazing injuries are both foreseeable and likely to occur, whereas the burden of requiring Delta Chi Omega to

---

[10]It appears that Gamma Chi was suspended following the events in this case and thus does not currently exist in any manner and does not have any members, officers, or other representatives. *See* R. 91, Status Rep. ¶ 5. It is up to Hankins to accomplish service in some way, or else let this apparently defunct (and probably judgment-proof) defendant go. The 90-day service period expired long ago, Fed. R. Civ. P. 4(m), so if there is no service by the next status hearing, the Court anticipates dismissing this defendant without prejudice.

not incorporate hazing in post-initiation pledging events is both small and reasonable. *Id*. So, on the facts pled, Delta Chi Omega owed a duty to Jordan. And on proximate cause and foreseeability, Delta Chi Omega (via Greenwell and Madlock-Henderson) knew that the hazing was triggering Jordan's mental health issues and that she was suicidal and had a plan to commit suicide. Am. Compl. ¶¶ 69, 217.

Of course, the Court recognizes that as a practical matter, a sorority chapter like Delta Chi Omega is not actually capable of "personally" carrying out any hazing. But its officers and members are. *See Bogenberger*, 104 N.E.3d at 1125 (assuming without analysis that local fraternity chapter could be held liable where officers engaged in hazing); *Quinn*, 507 N.E.2d at 1198 (assuming without analysis that local fraternity chapter could be held liable where members engaged in hazing). *See also First Chicago v. Industrial Comm'n*, 691 N.E.2d 134, 138 (Ill. App. Ct. 1998) (corporate entities are bound by the actions of their officers and directors if performed within the scope of their authority). And in this case, Hankins has specifically named both Greenwell and Madlock-Henderson as being personally involved in the hazing against Jordan. Am. Compl. ¶ 216. Although neither Greenwell nor Madlock-Henderson are explicitly identified as "officers" of Delta Chi Omega, their respective positions as graduate advisor and assistant graduate advisor support a plausible inference that they occupied officer roles within the graduate chapter. And even if they were not technically "officers," they were still "advisors," which suggests that they were not merely passive members of the supervisory graduate chapter, but were rather more closely involved with the conduct of the undergraduate sisters; after all,

Greenwell was the one who informed Jordan that she was clear to proceed to the pledging stage of the AKA membership-intake process. *Id.* ¶ 50. It is thus plausible that they also had a direct hand in promoting (or at least ratifying) the post-initiation hazing events that Jordan attended. So, Delta Chi Omega's motion to dismiss is denied, and the graduate chapter remains in the case.

### E. Allstate's Motion to Intervene

In addition to the motions to dismiss, Allstate Insurance Company filed a motion to intervene in this case, purporting to invoke Federal Rule of Civil Procedure 24. R. 137, Mot. Intervene. To provide some background, Allstate currently provides insurance coverage to one of the sorority member defendants, Raven Smith. Mot. Intervene at 2. According to Allstate, intervention is warranted as a matter of right because its interests are not fully protected by Smith. *Id.* at 1.

Under Rule 24(a)(2), a court must permit intervention on timely application by anyone (1) who "claims an interest relating to the property or transaction that is the subject of the action"; and (2) whose interest may be impaired or impeded by disposition of the action. Fed. R. Civ. P. 24(a)(2). Intervention is not permitted, however, if the "existing parties adequately represent that interest." *Id.* The Seventh Circuit has divided this rule into four elements: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action." *Planned Parenthood of Wisconsin, Inc. v. Kaul*, 942 F.3d 793, 797 (7th Cir. 2019) (cleaned up).

A court may deny a motion to intervene if the movant fails to establish any one of these requirements. *Id.* More fundamentally, Rule 24(c) requires that a motion to intervene "state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which the intervention is sought." Fed. R. Civ. P. 24(c).

Here, Allstate advances two arguments in support of intervention. First, Allstate notes that because it might be liable for some part of a settlement or judgment in this case, it needs to be kept in the loop on all discovery matters. To Allstate's thinking, because Smith is currently being represented by her own counsel, intervention is the only way for Allstate to ensure that it is receiving all relevant updates in the litigation. Mot. Intervene at 4. Second, Allstate suggests that there are misaligned incentives at play. The concern here is that Smith is motivated to dispense with the litigation as quickly as possible by simply settling for an amount up to the maximum insurance-coverage limit. Because Smith is not personally on the hook for any settlement or judgment, she will have no reason to put forth a strong defense or take a strong negotiating position in settlement talks. *Id.* Allstate, in contrast, seeks to minimize the settlement (or judgment) amount as much as possible. *Id.*

As a threshold matter, Allstate has failed to satisfy Rule 24(c)'s requirement that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which the intervention is sought." Fed. R. Civ. P. 24(c). So, for that reason alone, Allstate's motion to intervene may be denied. What's more—in part because

Allstate has failed to identify a claim or defense—it is difficult for the Court to figure out whether Allstate even has a "direct, significant, and legally protectable interest in the question at issue in the lawsuit." *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 658 (7th Cir. 2013). To be fair, Allstate has explained that it seeks intervention because it needs to be kept in the loop on discovery matters and because of the risk of misaligned incentives. But even if these were cognizable interests under Rule 24 (which they may or may not be), Allstate has failed to allege that Raven Smith will inadequately represent those interests.

For instance, Allstate repeatedly asserts that intervention is the only possible means by which it can remain "fully apprised of the litigation and of the information obtained in discovery." Mot. Intervene at 4-5. Specifically, Allstate contends that if it receives a settlement demand, then "it is necessary that [it] have complete information regarding the facts and damages." *Id*. at 4. But this is all speculation. No one suggests that there are active settlement discussions (let alone with Raven Smith in particular), and Allstate offers no evidence suggesting that Smith's counsel intends to keep the insurance carrier out of the loop in order to later spring an unfavorable settlement demand on it. Allstate has not even alleged that Smith's counsel is in fact planning to withhold relevant case information at all. In the absence of these facts, intervention is a drastic measure, considering that "a party granted leave to intervene as of right under this rule has the full rights of a party." *Planned Parenthood of Wisconsin*, 942 F.3d at 797 (cleaned up). In other words, Allstate would even have the right to issue discovery requests and attend depositions—which is

unnecessarily invasive if Allstate's only objective is to be kept apprised of facts uncovered during discovery. Indeed, Allstate acknowledges that it "does not seek to raise any issues that have not already been raised." Mot. Intervene at 3.

Nor has Allstate offered any evidence at this point to show an actual misalignment of incentives beyond the general risks of competing interests inherent to *any* situation in which an insurance carrier provides liability coverage to a defendant. For instance, there is no evidence of collusion between Smith and Hankins, and there is no reason to believe right now that Smith intends to simply settle for the highest amount allowed by her insurance policy instead of defending the case in good faith. And Allstate has not cited any authority suggesting that the general baseline risk of misaligned incentives is enough to warrant intervention as a matter of right.

So, for now, the motion to intervene is denied. Allstate may refile this motion if relevant evidence supporting intervention emerges later on.

## IV. Conclusion

Because Hankins has adequately alleged claims for negligence and emotional distress against the individual sorority members—Anderson, Brown, Chambers, Clemons, Smith, Valdez, Greenwell, and Madlock-Henderson—those motions to dismiss are denied in their entirety. R. 63, 65, 68, 94, 99, 103, 105, 131. Similarly, the motion to dismiss by Delta Chi Omega is also denied, R. 97, as is Allstate's motion to intervene, R. 137. But the motions to dismiss by AKA National and Walker-Steele are both granted, R. 57, though without prejudice for now. If Hankins believes that

she can fix the deficiencies in the First Amended Complaint, then she may propose a Second Amended Complaint by April 24, 2020. Absent a motion for leave to file a Second Amended Complaint, the dismissal will convert to a dismissal with prejudice as to those two defendants. Finally, the Court also reminds Hankins that Gamma Chi has not yet been served and so is not formally a party to this case. The status hearing of April 3, 2020 is reset to April 29, 2020, at 10 a.m. The remaining parties—Hankins, the individual sorority members, and Delta Chi Omega—shall confer and file a proposed discovery schedule by April 24, 2020, so that discovery can get going in this case.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 22, 2020